Francis GROSHEK and Karen Groshek,
Plaintiffs-Respondents-Petitioners,

v.

Michael G. TREWIN,
Defendant-Appellant-Cross Petitioner.

Supreme Court

*No. 2008AP787. Oral argument February 9, 2010.
—Decided June 24, 2010.*

2010 WI 51

(Also reported in 784 N.W.2d 163.)

For the plaintiffs-respondents-petitioners there were briefs by *Gary L. Dreier, Eric R. Johnson,* and *First Law Group S.C.,* Stevens Point, and oral argument by *Gary L. Dreier.*

For the defendant-appellant-cross petitioner there were briefs by *Mark J. Steichen and Boardman, Suhr, Curry & Field, LLP,* Madison, and oral argument by *Mark J. Steichen.*

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals[1] concerning rescission of a real estate contract on the grounds that the circumstances surrounding the transaction—an attorney's purchase of land from clients whose bankruptcy petition he handled—constituted a breach of fiduciary duty.

¶ 2. The two questions presented by this case are whether the circuit court's findings of fact concerning the transaction, if not clearly erroneous, and its conclusions of law satisfy the elements of a claim for breach of fiduciary duty, and whether the circuit court's award of punitive damages was proper.

¶ 3. We conclude that the findings of fact are supported by the evidence and that they satisfy the elements of a claim for breach of fiduciary duty, and we therefore affirm the court of appeals' decision that the attorney breached his fiduciary duty and that rescission is therefore warranted.

¶ 4. We also affirm the court of appeals' decision that punitive damages are not available in this case. The court of appeals' rationale focused on the equitable nature of the case; however, our decision is based on the

---

[1] *Groshek v. Trewin,* No. 2008AP787, unpublished slip op. (Wis. Ct. App. Mar. 26, 2009).

rule articulated in *Tucker v. Marcus*[2] that where there is no award of compensatory damages, punitive damages are not available. Because no compensatory damages were sought or awarded in this case, we do not reach the question of whether, in an action in which compensatory damages are awarded, recovery of punitive damages would be barred solely on the grounds that the action is equitable in nature.

## I. Background

¶ 5.   This action arises from the circumstances surrounding attorney Michael Trewin's November 2004 purchase of the Groshek family farm and saw mill. Trewin was the Grosheks' attorney of record when they filed for Chapter 13 bankruptcy in March 2004. In July of that year, the Grosheks fell behind on payments due to the bank, their major creditor, under the bankruptcy plan. Also in July, this court entered an order suspending for five months Trewin's Wisconsin law license, effective August 31, 2004.[3] In August, Trewin reached an agreement with the Grosheks' bank, which ultimately failed. Near the end of August, Trewin sent the Grosheks a written proposal that involved his buying their land and allowing them to lease it from him with an option to purchase. On August 30, the Grosheks signed two documents drafted by Trewin—a waiver of conflict of interest[4] and an agreement to sell the prop-

---

[2] *Tucker v. Marcus,* 142 Wis. 2d 425, 439, 418 N.W.2d 818 (1988) (holding that "punitive damages are not available where there has been no 'award' of actual damages").

[3] *In re Disciplinary Proceedings Against Trewin,* 2004 WI 116, ¶¶ 47, 50, 275 Wis. 2d 116, 684 N.W.2d 121.

[4] The waiver read as follows:

WRITTEN WAIVER OF CONFLICT OF INTEREST. We, Francis and Karen Groshek, hereby acknowledge that we contacted Michael Trewin regarding purchasing our real estate to pay the claim of

erty to him.[5] There was testimony from the Grosheks at trial that Trewin rushed the signing of the documents; they testified that their understanding was that it was necessary to sign the paperwork prior to Trewin's license suspension.

F&M Bank. Prior to entering into this agreement, Atty. Trewin told us the terms of the agreement, that he would profit on this arrangement by hopefully paying F&M Bank less than the $239,585.00 that is there [sic] secured claim, and by renting the real estate to us for 5 years, or until we buy the property back; further, we shall be responsible for all legal fees required to contemplate (sic) the agreement, and any charges charged by Trewin's lender, but in no event shall those fees/charges exceed $1,500.00. These fees are separate from the legal fees owed for the Chapter 13 bankruptcy. We further agree that we have received a copy of the agreement, as Trewin provided me with a draft of the agreement, and advised us that we should review this with counsel of my [sic] choice. We were also informed that by becoming a creditor of ours, Atty. Trewin may be put in a position where he might have to stop representing us if (1) we stop making payments on this lease, and he is forced to try to collect it, or (2) if his simply being a creditor raises a conflict of interest in any manner [sic] in which he is representing us.

We hereby waive any conflict of interest voluntarily, and acknowledge that the terms of this transaction are fair and reasonable. [Dated August 30, 2004. Signed, Francis R. Groshek, Karen Groshek].

[5] The agreement read as follows:

Agreement. This agreement, made by and between Francis and Karen Groshek (Groshek), and Michael Trewin (Trewin), provides as follows:

WHEREAS, Groshek is involved in a foreclosure action and bankruptcy wherein their real estate and equipment is being foreclosed by F&M Bank, and

WHEREAS Trewin has proposed buying the land owned by Groshek, paying off the claim of F&M Bank, selling roughly 40 acres of said land to John Piesek, and leasing the remaining land and buildings back to Groshek; and

WHEREAS Trewin has advised Groshek that should he purchase the land, that he will become a creditor of Groshek and that future

¶ 6. The conveyance of the property to Trewin occurred in November; he paid $94,500[6] for the home and 34 acres. After that, the Grosheks continued to live on the property and to pay rent to Trewin under a lease agreement, but they eventually stopped making rent payments, which resulted in Trewin's canceling of the lease.

¶ 7. The Grosheks subsequently sued Trewin for breach of fiduciary duty and sought rescission of the conveyance. The complaint was amended prior to trial to add a claim for punitive damages. Trewin counter-claimed for eviction and for the money he was owed for rent and moved for summary judgment on the Grosheks' claim.

representation in legal matters may or may not constitute a conflict of interest which would cause him to not be able to represent them, and

WHEREAS Groshek has had the opportunity to review this agreement prior to the execution of this agreement, and has been advised to review the agreement with another attorney of their choosing, which they have done,

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

1. Trewin shall purchase the real estate from Groshek on which F&M Bank holds a mortgage, in return for a full release of any claim against Groshek, and shall lease said property back to Groshek according to the terms of the attached lease, after selling roughly 40 acres of land to John Piesek and his brother.

2. This is the entire agreement between the parties, and Groshek has agreed to review this proposal with an independent attorney of their choosing, and freely and voluntarily enter into this agree-ment after meeting with said attorney. [Dated August 30, 2004. Signed, Francis R. Groshek, Karen Groshek, Michael G. Trewin]

[6] A separate conveyance of 40 acres was made to the Grosheks' neighbors at around that time; the details concerning that conveyance are not relevant to the issues presented here.

¶ 8. The Portage County Circuit Court, the Honorable Thomas T. Flugaur presiding, denied Trewin's motion for summary judgment. After a three-day trial to the court, the circuit court determined that Trewin had breached his fiduciary duty to the Grosheks; it then granted rescission of the conveyance of the property upon payment of $96,872.[7] The circuit court dismissed Trewin's counterclaim. The circuit court based its conclusion on the following findings of fact:

> The idea for the whole transaction was Trewin's, not the Grosheks'.

> The Grosheks did not want to sell their property, but Trewin portrayed the sale to them as the only option they had.

> The Grosheks did not understand the transaction and did not understand Trewin would have the ability to sell their property "out from underneath them."

> Trewin told the Grosheks the deal had to be done right away, and both of the Grosheks felt it was a rush deal because he was losing his license on August 31.

> Although the signed August 30 agreement stated that the Grosheks "ha[ve] had the opportunity to review this agreement prior to the execution of this agreement, and ha[ve] been advised to review the agreement with another attorney of their choosing, which they have done," the Grosheks had not done this when they signed it because Trewin had not given them a reasonable opportunity to do so.

> Trewin did not make full disclosure in that there was no purchase price specified, the profit he was going to make was not disclosed, and the buy-back process was not specified.

---

[7] This amount was the total that Trewin testified he had paid the bank for the property, including interest and fees for late payments.

> Trewin knew of the Grosheks' financial situation because he represented them in the bankruptcy, he knew it would be difficult for them to make the rental payments under the lease, and he expected that he would benefit from their default under the lease—if they defaulted in the first year, the lease would be terminated, as would the option to buy their property back.
>
> Trewin's letter to his own bank on August 24, 2004, seeking a loan to buy the property—in which he described his plans to subdivide twenty-four acres and sell the lots for a total of between $175,000 and $200,000— showed . . . his "predatory" intent toward the property.
>
> . . . [T]he terms of the transaction were unfair because the property was valued at $180,000 and Trewin purchased it for $94,500; even if the Grosheks had been able to buy it back at $127,500, the terms were still not fair to them.

*Groshek v. Trewin,* No. 2008AP787, unpublished slip op., ¶¶ 19–20, (Wis. Ct. App. Mar. 26, 2009). The circuit court went on to determine that punitive damages were appropriate, citing the vulnerability of the Grosheks, the access the defendant had gained as counsel for the Grosheks, and the defendant's repeated discipline for improperly making similar transactions with other clients.

¶ 9.   Trewin appealed. The court of appeals affirmed the denial of summary judgment, the dismissal of the counterclaim, and the determination that Trewin had breached his fiduciary duty to the Grosheks. It acknowledged the arguments of the parties about whether punitive damages could be awarded in the absence of compensatory damages; however, it held that the case was governed by *Karns v. Allen,*[8] which holds

---

[8] *Karns v. Allen,* 135 Wis. 48, 115 N.W. 357 (1908).

that punitive damages are not available in an action that seeks equitable relief.

¶ 10.   Trewin petitioned for review of the court of appeals' affirmance on the issue of breach of fiduciary duty; the Grosheks cross-petitioned the denial of punitive damages. This court granted the petition and cross-petition.

▬▬▬

¶ 11.   In reviewing the circuit court's findings of fact, we will not disturb them unless they are clearly erroneous. Wis. Stat. § 805.17(2).[9] "The trial court is the ultimate arbiter of the credibility of witnesses and a reviewing court will accept the inference drawn by the trier of fact." *Rivera v. Eisenberg,* 95 Wis. 2d 384, 388, 290 N.W.2d 539 (Ct. App. 1980). Whether the facts as found satisfy the elements of a claim for a breach of fiduciary duty is a question of law reviewed de novo. *Jorgensen v. Water Works, Inc.,* 2001 WI App 135, ¶ 8, 246 Wis. 2d 614, 630 N.W.2d 230. *See also Beloit Liquidating Trust v. Grade,* 2004 WI 39, ¶¶ 40–42, 270 Wis. 2d 356, 677 N.W.2d 298 (treating the question of whether a fiduciary duty existed as a question of law). Whether punitive damages are available is a question of law and is thus reviewed de novo. *Tucker,* 142 Wis. 2d at 432.

II. Whether Trewin Breached
His Fiduciary Duty to the Grosheks

▬▬

¶ 12.   To support their claim for breach of fiduciary duty, the Grosheks must satisfy three elements:   (1) that Trewin owed the plaintiffs a fiduciary

---

[9] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

duty, (2) that Trewin breached that duty, and (3) that that breach caused the Grosheks damage. *See Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 752 N.W.2d 800. The circuit court held that the Grosheks had proved that Trewin breached his fiduciary duty, and the court of appeals determined that the circuit court's findings in support of that determination were not clearly erroneous, and were sufficient to establish that breach.

¶ 13.   Trewin maintains that the elements are not met because nothing he did while he had an attorney-client relationship with the Grosheks constituted a breach of fiduciary duty, and because such a duty no longer existed at the time he purchased the Grosheks' land because the attorney-client relationship ceased when his law license was suspended on August 31, 2004. Specifically, he argues that an attorney has no fiduciary duty to former clients, and at the time of the property sale, the Grosheks were former clients. Because the bankruptcy filing made the Grosheks' financial distress a matter of public knowledge, Trewin argues that there is no basis for concluding that he used confidential information gained as the Grosheks' counsel in negotiating the purchase. He further argues that there was no injury to the Grosheks because the underlying cause of the sale of their land—their financial difficulties—did not result from his actions; in other words, they would have lost the farm whether he bought it or not. As for the documents signed by the Grosheks on August 30, 2004, Trewin argues that they imposed no legal obligation on the Grosheks and that he never sought to enforce them; therefore, they cannot serve as the basis for a finding of breach of fiduciary duty.

¶ 14.   The Grosheks argue that Trewin remained their attorney and thus retained a fiduciary duty to

260

them well beyond August 31, 2004, the date upon which his law license was suspended. They point to subsequent bills for legal services and the language of the waiver of conflict of interest, which they construe as implying that the attorney-client relationship would be ongoing and would be affected in the future only if they failed to make lease payments. They alternatively argue that agency law and rules of professional conduct impose an obligation on Trewin not to use information against a former client, and that those principles support a finding that Trewin had a continuing fiduciary duty to the Grosheks even if the attorney-client relationship had ended. Additionally, they argue that the information Trewin used did indeed include confidential information about the Grosheks far beyond what would have been publicly disclosed in bankruptcy filings, such as their neighbors' interest in purchasing part of the property, their own understanding of related tax liabilities, and other factors that ultimately played a role in the sale of the land.

■■

¶ 15. As the court of appeals did, we focus on the findings of fact the circuit court made, and like the court of appeals, we conclude that they are supported by the evidence and reasonable inferences, and are not clearly erroneous. For purposes of determining whether Trewin breached his fiduciary duty to the Grosheks, we need not determine precisely when the attorney-client relationship ceased to exist because Trewin acknowledges that an attorney has a fiduciary duty to an existing client, and until at least August 31, 2004, the Grosheks were undisputedly Trewin's clients. The circuit court held that there was a fiduciary duty at that time. The second element for liability is whether the duty was breached. In *Zastrow v. Journal Communications, Inc.*, 2006 WI 72, ¶ 30, 291 Wis. 2d 426, 718 N.W.2d 51, this court said,

A breach of the duty of loyalty imports something different from mere incompetence; it "connotes disloyalty or infidelity." *The Fiduciary Duty of Care, supra,* at 183 (citation omitted). At its core, a fiduciary's duty of loyalty involves a state of mind, so that a claimed breach of that duty goes beyond simple negligence. For example, a lawyer can breach his fiduciary duty of loyalty to a client by entering into a contract with a client without full disclosure that the contract will benefit the lawyer and potentially disadvantage the client.

¶ 16.   The circuit court invoked the above language from *Zastrow* before concluding that based on the evidence presented, there was not full disclosure by Trewin to the Grosheks with regard to the agreements they signed on August 30, 2004. The circuit court observed that the agreements lacked such details as the purchase price, expected profit, and what the buy-back option entailed. The circuit court also focused on the information Trewin gained by virtue of his trusted position as the Grosheks' lawyer. The circuit court also cited a letter from Trewin dated August 24, 2004, to his lender; the letter shows that Trewin, days before signing an agreement with the Grosheks, made representations that were not disclosed to the Grosheks on August 30, 2004, and, to say the least, are not consistent with the August 30 agreement.[10] The circuit court also noted that at the

---

[10] For example, the letter states, "I am looking to buy the real estate owned by the Grosheks, which I have negotiated a price of $195,000 for, resolving a foreclosure on the property. The land was appraised on January 6, 2004, for $208,000, which I feel is very conservative, based upon the fact that one of the neighbors is willing to buy 40 acres of the farmland for $2,700/acre—nearly twice as much as the land is appraised for ($1,500). Further, the farmland which is currently zoned A-1, is in the process of being re-classified as part of the smart growth

time of the August 30 agreement, the Grosheks were "unaware that they could buy back their property at a foreclosure sale . . . [and] unaware of the concept of an assignment of a judgment." As the circuit court concluded, the information they needed, in short, was information for which they would depend on an attorney. Although a second attorney represented the Grosheks in the real estate transaction in November,[11] the circuit court found that he "acted primarily as a scrivener in this whole thing," and

> [he] did not appear to be an actively engaged attorney, actively involved in the detailed representation that this type of a financial transaction would encounter. In fact, ultimately, his fees were paid through the closing transaction by Mr. Trewin paying $2,500 more for the property, all of which left the Court scratching its head on that testimony and that arrangement.

¶ 17. The circuit court also concluded that the Grosheks did not clearly understand the transaction based on the following evidence: one witness testified to Mrs. Groshek's shock when a "For Sale" sign went up on the property; and there was testimony that the Grosheks seemed to have understood the transaction to function as a lien on the property and to have a guaranteed buy-back option. As the court of appeals stated,[12]

> Trewin used his position of influence and the trust the Grosheks had in him to obtain a waiver of a conflict of

---

plan for that area as A-2, or 5 acre lots. My plans for this land are to sell off 6–7 parcels, the majority of which will be done within the next 24 months." The letter goes on to detail how the lots were to be divided and sold.

[11] That attorney testified in the trial to the circuit court.

[12] *Groshek v. Trewin,* No. 2008AP787, unpublished slip op., ¶ 28 (Wis. Ct. App. Mar. 26, 2009).

interest and their signatures on an agreement to sell, which stated they had consulted an attorney. He did this without disclosing the potential benefits to him of the sale and the potential risks to them, and knowing they had not consulted another attorney. . . . If the Grosheks' signing of those documents on August 30 was not significant, why did Trewin have them do so? Why did he tell them, as they testified and the [circuit] court found, that they had to do so on that date? The reason, the court found and the evidence supports, is that he was taking advantage of their trust in him as their attorney to get as much of the transaction as possible accomplished before his license was suspended.

¶ 18.   Such conduct, while Trewin was acting as the Grosheks' counsel, is hard to reconcile with the fiduciary duty of loyalty defined by this court in *Zastrow:*[13]

> This constraint on acting in one's own self-interest has been described as a fiduciary's duty of loyalty. However, the duty of loyalty is broader than simply requiring the fiduciary to refrain from acting in his own self-interest. For example, it also may require keeping a beneficiary's information confidential, and fully disclosing to the beneficiary all information relevant to the beneficiary's interest. Webster defines loyalty as "tenacious adherence" to principle and an obligation "based on individual choice."

*Zastrow,* 291 Wis. 2d 426, ¶ 29 (citations omitted). We agree that Trewin's conduct here fits the example given in *Zastrow*—entering into a contract with a client

---

[13] *Zastrow* discussed the fiduciary duties of trustees in the context of a dispute as to the nature of the tort involved and "whether the breach of fiduciary duty claims the circuit court found the plaintiffs proved were properly dismissed because the two-year statute of limitations applie[d] to them." *Zastrow,* 291 Wis. 2d 426, ¶ 23.

"without full disclosure that the contract will benefit the lawyer and potentially disadvantage the client"—and therefore constitutes a breach of fiduciary duty, including specifically the fiduciary duty of loyalty.

¶ 19. The final matter to address in regard to fiduciary duty is the question of whether the Grosheks proved that the breach caused damage. As noted above, Trewin argues that there was no damage here because it was clear that the Grosheks would not have been able to keep their property whether he was the buyer or someone else was. The Grosheks argue that Trewin's actions resulted in their receiving less for the property than they might have in a foreclosure auction or from another buyer.

██

¶ 20. We agree with the circuit court and the court of appeals that the Grosheks satisfied the damage element. The circuit court made repeated references to the advantage Trewin had, as a result of knowing the particulars of the Grosheks' financial situation, in setting the purchase price. The inference drawn by the circuit court, based on evidence of the value of the land and the purchase price, was that Trewin paid less for the land than another buyer would have paid. Trewin's attempts to focus attention further down the timeline cannot avail given the effort he made to obtain the Grosheks' signatures on August 30. As the court of appeals noted, Trewin had incentives for getting the signatures on those documents before his license was suspended: it is reasonable to infer that the agreement to sell was understood by at least the Grosheks to be binding; there is neither testimony nor documents providing evidence to the contrary. To infer otherwise would allow Trewin to benefit both from his acquiescence in the Grosheks' belief that the agreement was

legally enforceable, and later, when the propriety of the transaction is questioned, from his claim that the agreement would never have been enforced. Therefore, given that Trewin took advantage of the trust and information he gained as the Grosheks' counsel in order to gain their signatures on the agreement to sell, the agreement itself gave rise to an injury, and the fact that its full force was felt only later is no reason to minimize its effect.

¶ 21. Accordingly, the circuit court did not err when it determined that the Grosheks had proved the existence of a duty, because Trewin was, at least through August 30, 2004, acting as their attorney. Nor did it err when it determined that the Grosheks proved a breach of that duty because Trewin failed to disclose fully what he was required to disclose to the Grosheks as his clients. Finally, the circuit court did not err when it determined that the Grosheks proved damage because that conclusion is supported by evidence of the value of the property and the fact that the amount paid was far less than its value. Rescission is an appropriate remedy when property is acquired in connection with a breach of fiduciary duty. *Glojek v. Glojek*, 254 Wis. 109, 116, 35 N.W.2d 203 (1948) ("There can be no proper distinction between cases involving undue influence and breach of fiduciary relationship, on the one hand, and ordinary fraud in the inducement on the other, in so far as . . . the right to rescind or otherwise to get specific relief is concerned.").[14] We therefore affirm the court of appeals as to the determination of breach of fiduciary duty and the appropriateness of granting rescission of the conveyance.

[14] *See also Whipp v. Iverson,* 43 Wis. 2d 166, 168, 168 N.W.2d 201 (1969) ("Rescission of a contract in equity may be grounded on misrepresentations not intentionally made for the

## III. Whether the Grosheks
## May Recover Punitive Damages

¶ 22.   The Grosheks argue that punitive damages are necessary in this case because the remedy of rescission is insufficient to deter Trewin or others like him from "predatory conduct with respect to vulnerable clients." Trewin counters that punitive damages are by law unavailable in actions in equity; he argues besides that the record does not contain evidence of the kind of conduct for which punitive damages would be appropriate.

¶ 23.   We first review the kinds of cases in which courts have found punitive damage awards appropriate, then examine statutory and common law governing such awards, and then turn to the application of the law to this case. In a case last term that affirmed the availability of punitive damages in an injured seaman's claim against his employer for willful failure to pay for his food, lodging and medical care as required under maritime law, the United States Supreme Court observed that "[p]unitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct." *Atlantic Sounding Co., Inc. v. Townsend,* 129 S. Ct. 2561, 2566 (2009). Writing for the Court, Justice Thomas briefly outlined the common law roots and noted American courts' approval of punitive damages "in appropriate cases since at least 1784"[15]:

---

purpose of defrauding or inducing a person to act to his detriment for the speaker's economic benefit.")

[15] The United States Supreme Court listed the following examples of early cases that were deemed to warrant "damages for example's sake":

> American courts have likewise permitted punitive 'damages awards in appropriate cases since at least 1784. *See, e.g., Genay v.*

This Court has also found the award of punitive damages to be authorized as a matter of common-law doctrine. In *Day v. Woodworth,* 13 How. 363, 14 L.Ed. 181 (1852), for example, the Court recognized the "well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant . . . ." *Id.* at 371; see also *Philadelphia, W., & B.R. Co. v. Quigley,* 21 How. 202, 214, 16 L.Ed. 73 (1859) ("Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person"); *Barry v. Edmunds,* 116 U.S. 550, 562, 6 S.Ct. 501, 29 L.Ed. 729 (1886) ("[A]ccording to the settled law of this court, [a plaintiff] might show himself, by proof of the circumstances, to be entitled to exemplary damages calculated to vindicate his right and protect it against future similar invasions").

*Id.* at 2566–67.

¶ 24.  It may be true that it is "often recite[d] that punitive damages are not favored by the law"[16];

*Norris,* 1 S.C.L. 6, 7, 1784 WL 26 (C.P. and Gen. Sess. 1784) (approving award of "very exemplary damages" because spiking wine represented a "very wanton outrage"); *Coryell v. Colbaugh,* 1 N.J.L. 77, 1791 WL 380 (1791) (concluding that a breach of promise of marriage was "of the most atrocious and dishonourable nature" and supported "damages for *example's* sake, to prevent such offences in future" (emphasis in original)). . . . By the middle of the 19th century, "punitive damages were undoubtedly an established part of the American common law of torts [and] no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount.

*Id.* at 2566–67.

[16] David G. Owen, *A Punitive Damages Overview: Functions, Problems and Reform,* 39 Vill. L. Rev. 363, 371 (1994) (citing *Lyons v. Jordan,* 524 A.2d 1199, 1204 (D.C. 1987), which so states but permits punitive damages on facts of that case).

nevertheless, where cases involve conduct with a high "degree of grievousness or reprehensibility"[17] punitive damage awards are routinely held to be appropriate. Invoking a case by the United States Supreme Court, this court noted in *Trinity Evangelical Lutheran Church v. Tower Insurance Co.*,[18] "Punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition." As early as 1914, this court made clear that it was not inclined to second-guess a circuit court's $1,500 "punitory damages" award to "the father of Elsie Luther, . . . [who sought] such damages as are at common law recoverable in an action nominally for loss of services of a daughter caused by her seduction and consequent sickness, etc."[19]

---

*See, e.g., Jones v. Fisher,* 42 Wis. 2d 209, 226–27, 166 N.W.2d 175 (1969) (Hansen, J., dissenting) ("The concept of punitive damages, it has been said, is 'not a favorite of the law,' should be 'exercised with great caution,' and [should] properly be 'confined within the narrowest limits.' ") (citation omitted).

[17] *Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2003 WI 46, ¶ 57, 261 Wis. 2d 333, 661 N.W.2d 789 (affirming a grant of summary judgment in a bad faith insurance claim and allowing to stand a $3.5 million punitive damage award where insurer had refused coverage and refused to follow controlling case law, involving similar actions by the same insurer in an earlier case, where it also refused to reform a contract after the discovery of a mutual mistake).

[18] *Id.*, ¶ 46 (citing *BMW of North America v. Gore,* 517 U.S. 559, 568 (1996) (*Gore*)).

[19] *Luther v. Shaw,* 157 Wis. 234, 235, 147 N.W. 18 (1914). The court also upheld an award of exemplary damages in Elsie Shaw's separate case for breach of promise to marry, one of the types of cases that was deemed in Wisconsin and elsewhere to warrant the availability of punitive damages. *Luther v. Shaw,* 157 Wis. 231, 234, 147 N.W. 17 (1914) ("The damages[] . . . do

¶ 25. The availability of punitive damages is governed in Wisconsin, as in many states, in various respects by constitutional, statutory, and common law. The statute on punitive damages defines the evidence required to support an award of punitive damages, setting a high standard: "Standard of conduct. The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). In *Berner Cheese Corp. v. Krug*,[20] this court discussed the statute's revision by the legislature:

> The legislature enacted Wis. Stat. § 895.043(3) in 1995, thereby altering Wisconsin's common law standard for punitive damages. *Strenke,* 279 Wis. 2d 52, ¶ 19, 694 N.W.2d 296. In doing so, it heightened the state of mind required of a defendant from a "wanton, willful and reckless" disregard for rights of another to an "intentional disregard" for rights of another. *Id.*
>
> A defendant acts with intentional disregard if he or she: (1) "acts with a purpose to cause the result or conse-

---

not seem too large, nor are we convinced that an award of $3,000 damages in a breach of promise case aggravated by seduction of plaintiff indicates perversity, passion, or prejudice on the part of the jury. True it is that the defendant is an artisan without property, and that it required no long siege or consummate strategy to induce the plaintiff to surrender the citadel of virtue. But we must consider that he was an iron molder and she a factory girl, hence each probably more practical than refined or sentimental, and that she had his promise of marriage, and for this reason yielded, and that he was guilty of the perfidy of breaking such a promise, leaving her to bear the loss, suffering and shame alone, and that he attempted in the defense of this case in bad faith, as found by the jury, to further blacken her reputation.")

[20] *Berner Cheese Corp.,* 312 Wis. 2d 251, ¶¶ 63–64.

quence," or (2) "is aware that the result or consequence is substantially certain to occur from the person's conduct." Accordingly, in order to fall within Wis. Stat. § 895.043(3), a defendant's conduct must be (1) deliberate, (2) in actual disregard of the rights of another, and (3) "sufficiently aggravated to warrant punishment by punitive damages." We explained in *Strenke* that under this heightened threshold for punitive damages, we "expect circuit courts to serve as gatekeepers before sending a question on punitive damages to the jury."

*Id.* (citations omitted).

¶ 26. There are other principles that govern the availability of punitive damages and are potentially relevant to this case. For example, we have held that "where there exists a 'cause of action,' but the action is not one for which the recovery of compensatory damages is justified, punitive damages cannot be awarded." *Tucker,* 142 Wis. 2d at 440–41. And in *Karns,*[21] a case more than a hundred years old, this court held that "[t]he damages which may be recovered in an equitable action under our decisions are compensatory, and not exemplary, damages."[22]

¶ 27. Additionally, the United States Supreme Court has stated that there are constitutional limits to consider in some punitive damage awards: "when a[] [punitive damage] award can fairly be categorized as 'grossly excessive' . . . it enter[s] the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 569 (1996). In that instance, the Court based its analysis on the ratio between the compensatory damage and punitive damage awards, and concluded that the constitution did not permit a

---

[21] *Karns,* 135 Wis. at 58.

[22] *Karns,* 135 Wis. at 58.

"ratio of a breathtaking 500 to 1" (where compensatory damages were $4,000 and punitive damages were $2 million). *Id.* at 583. In another case reviewing a punitive damage award in the context of maritime law, the court summed up its recent decisions on constitutional requirements of punitive damages:

> The Court's response to outlier punitive damages awards has thus far been confined by claims at the constitutional level, and our cases have announced due process standards that every award must pass. Although "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," we have determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process[]"; "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee[.]"

*Exxon Shipping Co. v. Baker,* 128 S. Ct. 2605, 2626 (2008) (citations omitted).[23]

¶ 28. Of the constitutional, statutory, and common-law boundaries related to punitive damages, it was the common-law rule prohibiting punitive damages in equitable actions, from *Karns,* that the court of

---

[23] In its line of cases that address due process limits to punitive damage awards, including *Gore* and *Exxon Shipping Co.,* the United States Supreme Court has not addressed the corollary question, namely, whether or how the single-digit ratio between punitive damages and compensatory damages is to be applied in a case with an award of nominal damages. The present case does not give us occasion to address that question. Rather, we invoke *Gore* and *Exxon Shipping Co.* for the limited purpose of noting that the United States Constitution is one of several sources of law that impose limits on the availability of punitive damage awards.

appeals considered to be dispositive of this case. However, it is the rule from *Tucker*, concerning the requirement of compensatory damages, that we consider to be the threshold question. *Tucker* is of fairly recent vintage, and even though its focus is on a somewhat ancillary question,[24] it recognized the "general and perhaps almost universally accepted rule . . . that punitive damages cannot be awarded in the absence of actual damage" and further notes that "[t]his holding is firmly rooted in long-standing principles of Wisconsin law."[25] The court went on to say

> [W]hile not exact, the relationship between punitive and exemplary damages has been previously recognized as sufficiently similar to justify consistency in decisions regarding both types of damages. Consequently, to the extent that both treble damages and punitive damages operate as an enhancement of compensatory damages, recovery of compensatory damages should be similarly required for punitive damages. . . . Similar results have been reached in other jurisdictions. It is widely recognized that despite the unambiguous presence of actual harm, punitive damages are not available absent an award of compensatory damages.[26]

¶ 29.  In this case, no compensatory damages were sought or awarded. The Grosheks argue that *Tucker* and *Karns* should not bar recovery of punitive damages because in an equitable action a court can use its

---

[24] The specific question before the court in *Tucker* was whether the plaintiff was entitled to "punitive damages for the survival action where compensatory damages are not available under section 895.045 due to the apportionment of negligence." *Tucker*, 142 Wis. 2d at 431.

[25] *Id.* at 438–39.

[26] *Id.* at 443.

equitable powers to fashion an appropriate remedy and because Trewin "acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff," and thus falls within the ambit of Wis. Stat. § 895.043(3) for purposes of a punitive damage award. However, as noted above, the court has construed Wis. Stat. § 895.043(3) as setting the bar higher for the kind of evidence required to support a punitive damage award, rather than as expanding the category of cases where punitive damages may be awarded. In other words, within the category of cases where punitive damages may be appropriately awarded—those where compensatory damage awards have been made, for example—the legislature created a heightened standard as to the defendant's state of mind, requiring a showing of "intentional disregard" of the plaintiff's rights or a showing that "the defendant acted maliciously toward the plaintiff." In cases where punitive damages are barred in the first instance, the standard for conduct simply does not come into play. Therefore, our holding in *Tucker* forecloses recovery of punitive damages in a case where there is no award of compensatory damages.

¶ 30.   Because there was no compensatory damage award here, we do not reach the question raised concerning the principle articulated in *Karns,* above:   whether, in an equitable action where a court awards compensatory damages,[27] the fact that the action is an equitable action would then bar recovery of punitive damages. It is true, as the Grosheks point out, that the historical distinction between courts of law and courts of equity, and the differing treatment of equitable and legal

---

[27] *See Karns,* 135 Wis. at 58 (discussing the "general doctrines" of equitable actions, including equitable actions that involve the awarding of compensatory damages).

actions have faded over time.[28] The Grosheks rightly note that many jurisdictions[29] have rejected the rule that was generally accepted at the time of *Karns,* and have declined to bar punitive damages in an action merely on the grounds that it seeks equitable relief. Whether Wisconsin should likewise abandon that principle and overrule *Karns,* however, is a question for another day. The case before us is one in which no punitive damages can be awarded because there are no compensatory damages, and we decline to reach out to resolve the question presented by *Karns.*

## IV. CONCLUSION

¶ 31.   The two questions presented by this case are whether the circuit court's findings of fact concerning the transaction, if not clearly erroneous, and its conclusions of law satisfy the elements of a claim for breach of fiduciary duty, and whether the circuit court's award of punitive damages was proper.

¶ 32.   We conclude that the findings of fact are supported by the evidence, and that they satisfy the elements of a claim for breach of fiduciary duty, and we

---

[28] T. Leigh Anenson, *Treating Equity Like Law: A Post-Merger Justification of Unclean Hands,* 45 Am. Bus. L.J. 455, 456–58 (2008)(discussing the Federal Rules of Civil Procedure as having "reunited law and equity after five centuries of separation" and observing that the "historic boundary between law and equity was accidental and not functional").

[29] *E.g., Charles v. Epperson & Co.,* 137 N.W.2d 605, 618 (Iowa 1965) (holding that an equity court may in its discretion award exemplary damages for an intentional act of fraud); *Tideway Oil Programs, Inc. v. Serio,* 431 So. 2d 454, 460 (Miss. 1983) (allowing punitive damages in chancery courts); *I.H.P. Corp. v. 210 Central Park South Corp.,* 228 N.Y.S.2d 883 (N.Y. App. Div., 1962); *Z.D. Howard Co. v. Cartwright,* 537 P.2d 345 (Okla. 1975) (permitting punitive damages in action for rescission where fraud is present).

therefore affirm the court of appeals' decision that the attorney breached his fiduciary duty and that rescission is therefore warranted.

¶ 33.  We also affirm the court of appeals' decision that punitive damages are not available in this case. The court of appeals' rationale focused on the equitable nature of the case; however, our decision is based on the rule articulated in *Tucker v. Marcus* that where there is no award of compensatory damages, punitive damages are not available. Because no compensatory damages were sought or awarded in this case, we do not reach the question of whether, in an action in which compensatory damages are awarded, recovery of punitive damages would be barred solely on the grounds that the action is equitable in nature.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 34.  SHIRLEY S. ABRAHAMSON, C.J. (*concurring in part and dissenting in part*). I agree with those parts of the majority opinion that conclude that the attorney breached his fiduciary duty and that rescission is therefore warranted.

¶ 35.  I dissent from those parts of the majority opinion (including Part III) that conclude that punitive damages are not available in the instant case. I conclude, as did the circuit court, that punitive damages are available in the instant case. I would therefore remand this case to the circuit court to restore the judgment originally entered for punitive damages in the amount of $38,200.

¶ 36.  The present case raises two interrelated issues regarding punitive damages.

¶ 37.  First, are punitive damages precluded because the plaintiff otherwise proceeded in an action in equity and sought equitable relief, specifically rescission?

¶ 38. Second, may punitive damages be awarded when the claimant has suffered actual damages but has not sought or received a compensatory award and has not been granted even nominal nonpunitive money damages?

¶ 39. The answer to the second question is important in the context of the first question because in many equitable actions, relief is granted as was done here, without an award of compensatory damages.[1]

¶ 40. The majority opinion does not address the first question and answers the second question in the negative. I conclude that punitive damages are not precluded in an action in equity and that an award of nonpunitive money damages is not a prerequisite for an award of punitive damages when the claimant has suffered actual damages.

## I. History and Purpose of Punitive Damages

¶ 41. My answers to the two questions are informed by the history and underlying purpose of punitive damages. As the majority opinion correctly notes, punitive damages have long been awarded and can be traced back to at least 1784. Majority op., ¶ 23. Similarly, punitive damages were recognized in Wisconsin as early as 1854.[2]

¶ 42. As their very name implies, the distinct policy rationale of punitive damages is one of punish-

---

[1] 2 John J. Kircher & Christine M. Wiseman, *Punitive Damages Law and Practice,* § 20.04 at 20–13 (2d ed. 2000) ("Equitable relief does not often include the award of money damages since the results achieved through remedies such as rescission, injunction and reformation usually supply complete relief.").

[2] *McWilliams v. Bragg,* 3 Wis. 377 (*424), 382–83 (*430–31), 1854 WL 3450 (1854).

ment rather than payment. Punitive damages are intended to " 'vindicate [a claimant's] right and protect it against future similar invasions,' " majority op., ¶ 23 (quoting *Barry v. Edmunds,* 116 U.S. 550, 562 (1886)), and " 'to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition,' " majority op., ¶ 24. In this sense, the claimant's receipt of punitive damages is a means to an end, the means of communicating a societal message that the wrongdoer's conduct was of a kind that society will particularly punish. The punitive award is not made to compensate the specific loss but rather to deter similar unlawful future conduct, both by the wrongdoer and by others.[3]

## II. Punitive Damages in Equitable Actions

¶ 43.   A key, early Wisconsin case discussing punitive awards in an equitable action is *Karns v. Allen,* 135 Wis. 48, 115 N.W. 357 (1908). Writing more than 100 years ago, the *Karns* court noted "a great dearth of authority" on the subject of punitive damages in equitable actions.[4] The *Karns* court concluded, however, that when the applicable statute allowed claimants to elect between a suit at law and a suit in equity and the

---

[3] *Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2003 WI 46, ¶ 50, 261 Wis. 2d 333, 661 N.W.2d 789; *Mgmt. Comp. Servs., Inc. v. Hawkins, Ash, Baptie, & Co.,* 206 Wis. 2d 158, 193, 557 N.W.2d 67 (1996); *Tucker v. Marcus,* 142 Wis. 2d 425, 463, 418 N.W.2d 818 (1988) (Heffernan, C.J., dissenting) ("There is no doubt that the plaintiff is enriched, but this is a byproduct of the plaintiff's role as society's representative. The main goal of punitive damages is to deter outrageous behavior by showing the wrongdoer and other potential wrongdoers that a penalty will have to be paid for such actions."); I *The Law of Damages in Wisconsin* § 2.6, at 3–4 (Russell M. Ware ed., 5th ed. 2010).

[4] *Karns v. Allen,* 135 Wis. 48, 57, 115 N.W. 357 (1908).

claimants elected an equitable action, they thereby "brought themselves within the rules of equitable actions, and waived the right to recover exemplary [punitive] damages."[5]

¶ 44.  The *Karns* case can be read narrowly to apply only to cases in which the claimant is statutorily obligated to choose between suing in equity or at law.[6] Since the *Karns* case, the relevant law has changed considerably.[7] Wisconsin procedural statutes no longer differentiate between actions at law and proceedings in equity.[8] Thus, the statutory basis for *Karns* has largely been repealed. When *Karns* was decided, it remained a meaningful distinction for the court to say that claimants had brought their claim "within the rules of equitable actions" and thereby waived rights and remedies available at law, but today that distinction has ceased to have the same importance.[9] I see no reason to read the *Karns* case more broadly than is justified by its facts and its historic and statutory context. Accordingly, *Karns* should not be read to state that punitive damages may never be awarded in an equitable action.

---

[5] *Id.* at 59.

[6] Kircher and Wiseman conclude that there is no suitable explanation or justification for the waiver theory. 2 Kircher & Wiseman, *supra* note 1, § 20.04, at 20–16.

[7] *Karns v. Allen*, 135 Wis. 48, 115 N.W. 357 (1908), was predicated on Wis. Stat. § 3180 (1898), which explicitly distinguished between equitable actions and actions at law. The modern revision of the statute, codified as Wis. Stat. § 823.01 (2007–08) (governing Jurisdiction Over Nuisances) has been substantially changed. The language of Wis. Stat. § 823.01 no longer draws any distinction between law and equity.

[8] *See, e.g.,* Wis. Stat. § 801.01(2) (2007–08).

[9] The majority acknowledges, at ¶ 30 & n.28, that the historical distinctions between law and equity "have faded over time."

¶ 45. Since 1908, the Wisconsin Supreme Court has not reviewed in other contexts or under modern statutes whether punitive damages are available in equitable actions.

¶ 46. The Wisconsin court of appeals, however, addressed the issue in *White v. Ruditys,* 117 Wis. 2d 130, 139, 343 N.W.2d 421 (Ct. App. 1983),[10] an equitable action in which the circuit court awarded punitive but not compensatory damages. The court of appeals examined authority in Wisconsin and in other states and concluded that a strong current of modern decisions allow punitive damages in equity as well as at law. The court of appeals concluded that a circuit court acting in equity has discretion to award punitive damages.[11]

¶ 47. The court of appeals in the present case refused to follow the precedent of *White v. Ruditys,* which is directly on point, even though the court of appeals has no authority to overrule one of its own decisions.[12] Instead, the court of appeals reversed the circuit court's award of punitive damages in the present

---

[10] *White v. Ruditys,* 117 Wis. 2d 130, 343 N.W.2d 421 (Ct. App. 1983), also briefly concluded that "a court of equity has a great deal of flexibility in fashioning its remedy. . . . [T]his includes the awarding of attorney fees." *Id.* at 142. This statement was overruled by an unpublished decision of the court of appeals. *See Nourse v. Marchetta,* No. 89–0493, unpublished slip op. (Wis. Ct. App. Dec. 07, 1989).

[11] The court of appeals cited numerous cases from other jurisdictions, and closely reviewed *I.H.P. Corp. v. 210 Central Park South Corp.,* 228 N.Y.S.2d 883 (App. Div. 1962), *aff'd,* 189 N.E.2d 812 (N.Y. 1963), the "seminal case adopting the modern view," and cited Dan B. Dobbs, *Handbook on the Law of Remedies,* § 3.9, at 2.11 (1973), among other authorities supporting its holding.

[12] *Cook v. Cook,* 208 Wis. 2d 166, 186–90, 560 N.W.2d 246 (1997).

case, declaring that the court of appeals in *White v. Ruditys* had impermissibly declined to follow the controlling precedent of *Karns*. The court of appeals acknowledged that "[t]here may be good reasons to reexamine *Karns*," but concluded that "those reasons must be directed to the supreme court."[13] *White v. Ruditys* was decided 75 years after *Karns* and was a precedential opinion in its own right for another 27 years. It seems to me that overruling *White v. Ruditys* should have been left to this court.

¶ 48. In my view, the "strong current" of modern law, and the reasons sustaining it, have, if anything, only gained greater strength since *White v. Ruditys* was decided in 1983. Many contemporary court decisions that have considered whether punitive damages may be awarded in an equitable action have answered this question in the affirmative.[14] Their reasoning is persuasive: A court in an equitable action is charged with granting relief that equity and good conscience re-

[13] *Groshek v. Trewin*, 2009 WI App 56, ¶ 40, 317 Wis. 2d 730, 768 N.W.2d 62.

[14] *Commonwealth of Ky. Dep't of Ag. v. Vinson*, 30 S.W.3d 162, 166 (Ky. 2000) ("The trend throughout this nation is to allow recovery for punitive damages in an equitable action").

Professor Dobbs reports that contemporary decisions allow punitive damages in equitable actions:

> The traditional rule was that equity would not award punitive damages, either because equity's sole province was to provide "complete relief," and compensatory damages marked the limit of that relief, or because punishment or vengeance seemed vaguely inappropriate to a "benignant" equity. Though this rule is rejected by contemporary decisions that have addressed it as a serious issue, there are cases that still repeat it.

Dan B. Dobbs, *Dobbs Law of Remedies* § 3.11(1), at 460 (2d ed. 1993).

quire.[15] If a legally protected interest has been invaded, and the nature of the conduct warrants the award of punitive damages, why shouldn't the responsible party be penalized? Given the statutory and procedural merger of law and equity, why should a court at law, but not in equity, have the power to impose punitive damages? The award of punitive damages in Wisconsin is now governed by statute, Wis. Stat. § 895.043, which establishes a standard of conduct allowing for punitive damages and a procedure for their award, but draws no distinction between law and equity. The incongruous nature of maintaining such a distinction is even more heightened when one considers that in actions both in law and at equity, conduct causing injury to a legally protected interest has been shown.[16] Does society's

For a discussion of reasons that equity courts do not award punitive damages, see 2 Kircher & Wiseman, *supra* note 1, § 20.04.

[15] "The overall goal of equity [is] to achieve justice between the parties who are subject to its jurisdiction." 2 Kircher & Wiseman, *supra* note 1, § 20.04, at 20–13.

[16] For cases adhering to this reasoning and allowing punitive damages in an equitable action, see, *e.g., Charles v. Epperson & Co.,* 137 N.W.2d 605, 618–19 (Iowa 1965); *Kennedy v. Thomsen,* 320 N.W.2d 657, 659, (Iowa Ct. App. 1982); *Tideway Oil Programs, Inc. v. Serio,* 431 So. 2d 454, 463–64 (Miss. 1983); *Forster v. Boss,* 97 F.3d 1127, 1130 (8th Cir. Mo. 1996) (applying Missouri law) ("[A] court of equity may award injunctive relief and actual and punitive damages as an adjunct to its equity jurisdiction."); *Madrid v. Marquez,* 33 P.3d 683 (N.M. App. 2001); *I.H.P. Corp. v. 210 Cent. Park S. Corp.,* 228 N.Y.S.2d 883 (1962); *Jones v. Morrison,* 458 S.W.2d 434, 438 (Tenn. App. 1970); *see also McPeak v. McPeak,* 593 N.W.2d 180, 184 (Mich. App. 1999) ("[E]xemplary damages are permissible in both legal and equitable actions where the plaintiff pleads malicious and wilful conduct.").

interest in punishing and deterring such harmful conduct turn on the arbitrary and generally anachronistic distinction of the nature of the action through which the injury is vindicated? I do not think that such a distinction can be maintained given the merger of law and equity and the contemporary law of punitive damages.

¶ 49.   The historic rule that courts cannot award punitive damages in equitable actions has eroded over the years.[17] I conclude that Wisconsin should not adopt or maintain such a blanket rule.

For cases awarding punitive damages in equitable rescission, see, *e.g., Medasys Acquisition Corp. v. SDMS, P.C.,* 55 P.3d 763, 767 (Ariz. 2002) (concluding punitive damages allowable in rescission action to punish the wrongdoer for his conduct); *Ind. & Mich. Elec. Co. v. Harlan,* 504 N.E.2d 301, 307 (Ind. App. 1987) (stating that "the granting of affirmative equitable relief will support an award of punitive damages"); *Capitol Fed. Sav. & Loan Ass'n v. Hohman,* 682 P.2d 1309, 1310–11 (Kan. 1984) (allowing punitive damages incidental to equitable relief of rescission); *Z.D. Howard Co. v. Cartwright,* 537 P.2d 345, 348 (Okla. 1975) (holding that the Uniform Commercial Code's permissive recovery of damages in rescission actions includes punitive damages where breach of contract "is accompanied by fraudulent acts which are wanton, malicious and intentional").

For a collection of cases on the power of an equity court to award punitive damages, see Jay M. Zitter, *Punitive Damages: Power of Equity Court to Award,* 58 A.L.R. 4th 844 (2010); 2 Kircher & Wiseman, *supra* note 1, §§ 20.05, 20.06.

[17] 2 Kircher & Wiseman, *supra* note 1, § 20.06, at 20–25; *see also* Linda L. Schlueter, *Punitive Damages* § 4.1(A)(3)(a), at 135–36 (5th ed. 2005):

Although the traditions of equity remain, the practice of denying punitive damages is changing. Thus, the recent trend of court decisions indicates that punitive damages will be allowed in equity as well as at law. The rationale for this modern view is that to do otherwise would subvert the very purpose of the merger of law and

## III. Actual Damages Requirement

¶ 50.  Whether an award of "actual damages" is required for an award of punitive damages has generated much litigation, in large part because the words "actual damages" are subject to numerous meanings in different contexts, and courts have divided on what their proper interpretation should be.[18] Actual damages may mean that the claimant was awarded a judgment to recover for actual damages, or it may mean that the claimant sustained a legally compensable injury.[19] Competing meanings of "actual damages" have led courts to take a number of different positions on whether compensatory damages are a prerequisite to a punitive damages award.[20]

equity . . . . Practically speaking, there is no reason to forbid punitive damages in equity actions.

For cases allowing punitive damages in equity actions, see, *e.g.*, *Charles v. Epperson & Co.*, 137 N.W.2d 605, 618–19 (Iowa 1965); *Tideway Oil Programs, Inc. v. Serio*, 431 So. 2d 454, 463–64 (Miss. 1983); *Kennedy v. Thomsen*, 320 N.W.2d 657, 659 (Iowa Ct. App. 1982).

For a discussion of punitive damages in equitable actions in Australia, New Zealand, Canada, England, and some American states, see Anthony Duggan, *Exemplary Damages in Equity: A Law and Economics Perspective*, 26 Oxford J. Legal Stud. 303 (2006).

[18] For a discussion of actual damages as a prerequisite to a punitive damages award, see 1 Kircher & Wiseman, *supra* note 1, § 5.21.

[19] *Tucker v. Marcus*, 142 Wis. 2d 425, 455–56, 418 N.W.2d 818 (1988) (Heffernan, C.J., dissenting); Dobbs, *supra* note 14, § 3.11(10), at 512–16.

[20] For a collection of cases, see Richard C. Tinney, Annotation, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages—Modern Cases*, 40 A.L.R. 4th 11 (1985).

¶ 51. In Wisconsin, punitive damage awards are permitted when a claimant is awarded even nominal damages.[21] If "actual damages" means that compensatory damages are actually recovered, it is difficult to explain why nominal damages will support a punitive damages award while their absence may defeat it. A claimant is not actually compensated for his or her injuries by an award of nominal damages.

¶ 52. From my perspective, the actual damages requirement means that the claimant must establish a cause of action, whether at law or in equity, before punitive damages can be awarded.[22] Once there is a valid cause of action and thus a legally cognizable harm, no reason exists to deny punitive damages merely because the claimant's relief is not pecuniary. The question of whether punitive damages are available depends on the nature of wrongdoer's conduct, not on the type of relief sought.[23] Indeed, if the wrongdoer's conduct is so harmful or egregious as to warrant the imposition of punitive damages, the very lack of com-

---

[21] *Jacque v. Steenberg Homes, Inc.,* 209 Wis. 2d 605, 621, 563 N.W.2d 154 (1997) (action for intentional trespass to land; $1 nominal damages). *See also Robison v. Lescrenier,* 721 F.2d 1101, 1102 (7th Cir. 1983) (applying Wisconsin law; awarding $10,000 punitive damages with six cents nominal damages).

[22] "The reason for [a requirement of actual damages] is that it first insures that some legally protected interest has been invaded. It prevents the assessment of punitive damages against one who may have caused damage without legal injury." *Village of Peck v. Denison,* 450 P.2d 310, 314–15 (Idaho 1969).

[23] Wis. Stat. § 895.043(3) ("The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.").

pensatory damages may increase the need for punishment and deterrence.[24]

¶ 53. I conclude that the failure to recover compensatory damages—actual, presumed, nominal, or otherwise—has no logical bearing on the propriety of a punitive award. The suitability of a punitive damage award should be determined by the usual rule, evaluating the nature of the wrongdoer's conduct. The economic magnitude of the wrongdoing may or may not be properly represented by an award of compensatory damages and the absence of such an award should not raise a categorical bar to punitive damages if the conduct otherwise warrants them.[25]

¶ 54. For the reasons set forth, I write separately.

[24] *See* Dobbs, *supra* note 14, § 3.11(10), at 512–16.

[25] Numerous courts have concluded that an award of compensatory damages is not a prerequisite for an award of punitive damages. *See, e.g., Beard v. Flying J., Inc.,* 116 F. Supp. 2d 1077, 1081 (S.D. Iowa 2000) (applying Iowa law), *aff'd in relevant part,* 266 F.3d 792, 804 (8th Cir. 2001); *Platté v. Whitney Realty Co., Inc.,* 538 So. 2d 1358, 1360 (Fla. Ct. App. 1989); *Nash v. Craigco, Inc.,* 585 P.2d 775, 778 (Utah 1978); *Haskins v. Shelden,* 558 P.2d 487, 493 (Alaska 1976); *Kennedy v. Thomsen,* 320 N.W.2d 657, 659–60 (Iowa 1960).