DATA KEY PARTNERS,
Plaintiff-Appellant,

v.

PERMIRA ADVISORS LLC, Raphael Holding Company,
Terrance D. Paul, Judith Ames Paul,
Addison L. Piper, Harold E. Jordan,
Mark D. Musick, Randall J. Erickson,
Glenn R. James and Raphael Acquisition Corp.,
Defendants-Respondents,†

RENAISSANCE LEARNING, INC.,
Defendant.

Court of Appeals

*No. 2012AP1967. Submitted on briefs May 3, 2013.
—Decided August 1, 2013.*

2013 WI App 107

(Also reported in 837 N.W.2d 624.)

† Petition for Review granted 12-16-13.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Stacy Taeuber* of *Law Offices of Stacy Taeuber*, Madison, and *Richard B. Brualdi* of *The Brualdi Law Firm, P.C.*, New York, New York.

On behalf of the defendants-respondents, the cause was submitted on the joint brief of *Jonathan C. Medow* of *Mayer Brown LLP*, Chicago, Illinois; *Leon S. Schmidt, Jr.*, of *Schmidt & Grace*, Wisconsin Rapids; *Nancy J. Sennett, Andrew J. Wronski*, and *Eric Pearson* of *Foley & Lardner LLP*, Milwaukee; *Garrett J. Waltzer* of *Skadden, Arps, Slate, Meagher & Flom LLP*, Palo Alto, California; and *Howard A. Pollack* and *Michael B. Apfeld* of *Godfrey & Kahn, S.C.*, Milwaukee.

Before Blanchard, P.J., Lundsten and Higginbotham, JJ.

¶ 1. BLANCHARD, P.J. Data Key Partners, a former minority shareholder in Renaissance Learning, Inc., appeals a circuit court judgment that dismissed Data Key's claims arising out of the sale of Renaissance to Permira Advisors, LLC. Data Key alleged that Renaissance's directors and its majority shareholders (who are also directors) breached various fiduciary duties and that Permira aided and abetted the breaches. Data Key argues that the circuit court erred in concluding that its complaint failed to state a claim upon which relief may be granted. As primary support for this argument, Data Key asserts that the court erred in giving the Renaissance directors the benefit of the business judgment rule at the motion to dismiss stage of the proceedings.

¶ 2. We conclude that the circuit court should not have applied the business judgment rule to Data Key's claims at the motion to dismiss stage. Based in part on that conclusion, we further conclude that the court erred in dismissing Data Key's claim against the directors for breach of fiduciary duty. We also conclude that the court erred in dismissing Data Key's claim against the Pauls for breach of fiduciary duty in their capacity as majority shareholders. However, Data Key fails to persuade us that the court erred in dismissing the claim against the directors for failure to disclose information and the claim against Permira for aiding and abetting breaches of fiduciary duty. We reverse and remand for further proceedings on Data Key's surviving claims.

## BACKGROUND

¶ 3. Unless otherwise indicated, the facts below are drawn from the allegations in Data Key's complaint. We take the allegations as true for purposes of Data Key's appeal from the circuit court's decision on a

motion to dismiss for failure to state a claim. *See Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 923, 471 N.W.2d 179 (1991). We summarize some of the most pertinent allegations here, referencing additional allegations as needed in discussion below.

¶ 4. Renaissance was a publically traded Wisconsin corporation before being sold to Permira and affiliated entities. The board of directors of Renaissance included Terrance and Judith Paul. The Pauls cofounded Renaissance and owned or controlled a majority of its shares.

¶ 5. As indicated above, Data Key was a minority shareholder in Renaissance. Renaissance had approximately 29 million shares of common stock outstanding, held by approximately 269 stockholders and by more than 2,000 beneficial owners.

¶ 6. It is undisputed for purposes here that the sale of Renaissance required the approval of a majority of its board and a majority of its shareholders.

¶ 7. The events leading to the sale of Renaissance to Permira began with the Pauls' decision to "cash out" their ownership in Renaissance as part of their retirement plans. Given the large number of shares that the Pauls held, they were unable to sell their shares on the open market. Also, the Pauls believed they could maximize the share price by selling the entire company. The Pauls' personal banker, Goldman Sachs, was selected to act as financial advisor for the sale of Renaissance.

¶ 8. Renaissance and Permira entered into an "Agreement and Plan of Merger" under which Permira would merge with or purchase Renaissance for $14.85 per share.[1] A different company, Plato Learning, Inc.,

---

[1] The parties sometimes refer to the "sale" of Renaissance to Permira, and sometimes refer to a "merger" of the two companies. The parties suggest no reason why it matters for purposes of this appeal which way we characterize the transaction.

then offered to purchase Renaissance for $15.50 per share.

¶ 9. The Renaissance board of directors rejected the Plato offer and instead entered into an amended agreement with Permira under which Permira would pay $15 per share to the Pauls and $16.60 per share to minority shareholders. The directors made this decision for several reasons, including: the Pauls thought that a deal with Permira had a high likelihood of closing, the Pauls believed that any deal with Plato carried a higher risk of non-consummation, and a failure to close a deal with Permira would result in a $13 million termination fee. In addition, Permira had agreed to grant a license benefitting a separate company controlled by the Pauls.

¶ 10. Plato made a revised offer consisting of $15.10 per share for the Pauls and $18 per share for minority shareholders, equaling an aggregate purchase price of approximately $471 million. The Pauls informed the other board members that they would not support acceptance of this revised Plato offer.

¶ 11. Plato made a third offer for a total of approximately $496 million. This offer was also rejected by Renaissance leadership, and Renaissance was sold to Permira. From what we can discern from the parties' arguments and the record, the sale resulted in a price of $15 per share for the Pauls and $16.60 per share for minority shareholders, consistent with the amended agreement between Renaissance and Permira.

¶ 12. Alleging that it represented the minority shareholders as a class, Data Key sued the Pauls, the other Renaissance directors, and Permira.[2] Data Key alleged four claims, all involving the sale:

---

[2] Data Key initially brought suit before the sale was consummated. However, the operative complaint here is Data Key's second amended complaint, filed after the sale.

354

(1) A claim against the Renaissance directors, including the Pauls, for breach of fiduciary duty. Data Key alleged breach of those duties based on a variety of conduct, including that the non-Paul directors abdicated their responsibilities as directors and submitted to the will of the Pauls, and that the directors had personal interests in the sale.

(2) A claim against the Pauls for breach of fiduciary duty in their capacity as majority shareholders, namely, placing their own interests over those of the minority shareholders.

(3) A claim against the directors for failure to disclose information.[3] Data Key alleged that the directors omitted material information from the proxy statement describing the sale, including information regarding alleged conflicts of interest by Goldman Sachs, which prevented the shareholders from making informed decisions on whether to vote in favor of the sale to Permira.

(4) A claim against Permira for allegedly aiding and abetting breaches of fiduciary duty by the other defendants.

¶ 13. The circuit court dismissed Data Key's complaint, concluding that Data Key failed to state a claim upon which relief may be granted. We address the circuit court's reasoning as needed in the discussion below.

---

[3] According to Data Key's allegations, the directors' duty to disclose information arises from the directors' fiduciary duty, and it is undisputed that the failure to disclose claim is a breach of fiduciary duty claim. However, following the parties' lead, we analyze this claim separately and refer to it as the "failure to disclose" claim to avoid confusion with Data Key's first claim, for breach of other fiduciary duties against the directors.

¶ 14. As indicated above, Data Key appeals. The defendants—the Pauls, the other directors, and Permira—have submitted a joint response brief.

## DISCUSSION

■

¶ 15. We review a circuit court's decision on a motion to dismiss for failure to state a claim de novo. *H.A. Friend & Co. v. Professional Stationery, Inc.*, 2006 WI App 141, ¶ 8, 294 Wis. 2d 754, 720 N.W.2d 96. "The facts set forth in the complaint must be taken as true and the complaint dismissed only if it appears certain that no relief can be granted under any set of facts that the plaintiffs might prove in support of their allegations." *Northridge Co.*, 162 Wis. 2d at 923. "The reviewing court must construe the facts set forth in the complaint and all reasonable inferences that may be drawn from those facts in favor of stating a claim." *Id.* at 923–24.

*1. Claim Against Directors for Breach of Fiduciary Duty*

¶ 16. As to Data Key's first claim, for breach of fiduciary duty by the directors, the court appeared to conclude that the only reasonable inference from the complaint allegations was that the directors reasonably exercised their business judgment. The court similarly appeared to conclude that the complaint supported a reasonable inference that there were "issues" or "questions" as to the likelihood of a Plato deal closing, and that the directors thus reasonably declined to pursue such a deal. In addition, the court relied on a Delaware case, *Mendel v. Carroll*, 651 A.2d 297 (Del. Ch. 1994), as standing for the proposition that a board's fiduciary

duties do not authorize the board "to deploy corporate power against the majority stockholders."[4]

¶ 17. Data Key argues that the circuit court erred in failing to adhere to the pleading standards applicable to a motion to dismiss. As primary support for this argument, Data Key argues that the court erred in applying the business judgment rule at the motion to dismiss stage of proceedings. Data Key also argues that the court's reliance on *Mendel* was misplaced. We agree with Data Key's arguments, each of which we discuss in more detail below.

### a. Business Judgment Rule

¶ 18. We begin with Data Key's argument regarding the business judgment rule. The circuit court dismissed Data Key's claim against the directors for breach of fiduciary duty based in significant part on the court's application of that rule. Similarly, many of the defendants' arguments depend on the application of that rule.

¶ 19. "The business judgment rule . . . contributes to judicial economy by limiting court involvement in business decisions where courts have no expertise and contributes to encouraging qualified people to serve as directors by ensuring that honest errors of judgment will not subject them to personal liability." *Reget v. Paige*, 2001 WI App 73, ¶ 17, 242 Wis. 2d 278, 626 N.W.2d 302. The rule "generally works to immunize

---

[4] Wisconsin courts often look to Delaware authority for guidance on corporate law. *Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, ¶ 35, 316 Wis. 2d 640, 764 N.W.2d 904.

individual directors from liability and protects the board's actions from undue scrutiny by the courts." *Id.*

> [T]his court will not substitute its judgment for that of the board of directors and assume to appraise the wisdom of any corporate action. The business of a corporation is committed to its officers and directors, and if their actions are consistent with the exercise of honest discretion, the management of the corporation cannot be assumed by the court.

*Id.* (quoted source omitted).

¶ 20. The business judgment rule is codified in Wisconsin in Wis. Stat. § 180.0828 (2011–12)[5] and currently provides, as most pertinent here, as follows:

> **Limited liability of directors. (1)** Except as provided in sub. (2), a director is not liable to the corporation, its shareholders, or any person asserting rights on behalf of the corporation or its shareholders, for damages, settlements, fees, fines, penalties or other monetary liabilities arising from a breach of, or failure to perform, any duty resulting solely from his or her status as a director, unless the person asserting liability proves that the breach or failure to perform constitutes any of the following:
>
> (a) A willful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director has a material conflict of interest.
>
> . . . .
>
> (d) Willful misconduct.

¶ 21. Data Key argues that the business judgment rule is an "evidentiary" presumption that may be applied on a motion for summary judgment but not on a

---

[5] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

motion to dismiss. It relies on Wisconsin's liberal notice pleading standards, summarized above, and on Wisconsin case law, such as *Reget*, addressing the business judgment rule. *See Reget*, 242 Wis. 2d 278, ¶¶ 18–22 (applying the business judgment rule at the summary judgment stage and stating that, "[p]rocedurally, the business judgment rule creates an *evidentiary presumption* . . . ." (emphasis added)). Data Key asserts, and our research appears to confirm, that there is no Wisconsin case law in which the rule was applied on a motion to dismiss for failure to state a claim. *See id.*; *see also Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 355–56, 359–60, 377 N.W.2d 593 (1985) (addressing the rule at trial stage); *Yates v. Holt-Smith*, 2009 WI App 79, ¶¶ 12, 22–26, 319 Wis. 2d 756, 768 N.W.2d 213 (same); *Noonan v. Northwestern Mut. Life Ins. Co.*, 2004 WI App 154, ¶¶ 15–16, 276 Wis. 2d 33, 687 N.W.2d 254 (concluding it was unnecessary to address argument that business judgment rule does not apply at motion to dismiss stage); *Gebhardt v. Bosben*, unpublished slip op., No. 2009AP1359, ¶¶ 55–58 (WI App June 24, 2010) (applying the rule at summary judgment stage).

¶ 22. The defendants argue, in contrast, that the rule is one of "immunity" and is a "legal" presumption. They argue that a complaint should therefore be dismissed for failure to include allegations that would overcome the rule's protections. *See Heinritz v. Lawrence Univ.*, 194 Wis. 2d 606, 612, 535 N.W.2d 81 (Ct. App. 1995) (suggesting that a claim could be dismissed for failing to allege facts to overcome an applicable legal presumption in the context of a contract terminable at will). The defendants assert that the business judgment rule was applied on a motion to dismiss in at least one recent Seventh Circuit Court of

Appeals case, *Dixon v. ATI Ladish LLC*, 667 F.3d 891 (7th Cir. 2012), and in at least one Wisconsin circuit court decision. The defendants argue that, if a plaintiff fails to allege facts that, if proven, would plainly overcome the business judgment rule, there is no reason to continue litigation.

¶ 23. We conclude that Data Key's arguments are more persuasive. The authorities that Data Key cites, along with our own research, persuade us that courts in notice pleading jurisdictions traditionally disfavor application of the business judgment rule at the motion to dismiss stage because application of the rule generally requires a fact-intensive analysis that would be incompatible with notice pleading. One commentator concisely summarizes this view as follows:

> Federal courts . . . generally adhere to the principle that determination and application of the business judgment rule requires a fact-intensive analysis that is inappropriate at the motion-to-dismiss stage. In *Shamrock Holdings, Inc. v. Arenson*, the District Court for the District of Delaware stated that "[a]ccording to the Third Circuit, '[g]enerally speaking, we will not rely on . . . the business judgment rule to trigger dismissal of a complaint under [Federal] Rule [of Civil Procedure] 12(b)(6).' ' Also, in *FDIC v. Stahl*, the court held that "[t]he application of the business judgment rule for the purpose of a motion to dismiss is questionable" and that "[d]efendants may argue the application of the business judgment rule at the summary judgment stage." Federal courts have further held that requiring this amount of factual support at this stage in litigation would not correspond with the [notice] pleading standard . . . .

Zachary H. Starnes, *The Business Judgment Rule After Twombly and Iqbal: Must Plaintiffs Now Plead Around the Rule to Survive a 12(b)(6) Motion to Dis-*

*miss?,* 35 AM. J. TRIAL ADVOC. 639, 655 (Spring 2012) (footnotes omitted); *see also Ad Hoc C mte. of Equity Holders of Tectonic Network, Inc. v. Wolford,* 554 F. Supp. 2d 538, 557 (D. Del. 2008) (concluding that claimant need not plead facts sufficient to overcome a business judgment rule defense in order to survive a motion to dismiss).[6]

¶ 24. This view of the business judgment rule, as generally inapplicable at the motion to dismiss stage in a notice pleading jurisdiction such as Wisconsin, is supported by what occurred in *Reget.* There, corporate directors first raised the rule as an affirmative defense, and then, at the summary judgment stage of proceedings, they submitted evidence supporting a reasonable inference that they acted in good faith. *See Reget,* 242 Wis. 2d 278, ¶¶ 9, 20. The court concluded that, in order to survive summary judgment, the plaintiffs needed to produce evidence to support a reasonable inference to the contrary. *See id.,* ¶ 20.[7]

---

[6] The cited article explains that *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), may be viewed as heightening the pleading standard under the federal rules of procedure; observes that it is "yet unclear what effect, if any, the heightened pleading standard may have on [Fed. R. Civ. P.] 12(b)(6) motions involving the application of the business judgment rule"; and asserts that *Twombly* "effectively requires courts to consider whether a plaintiff has pleaded facts demonstrating that the defendant directors are not shielded from liability by the business judgment rule." *See* Zachary H. Starnes, *The Business Judgment Rule After Twombly and Iqbal: Must Plaintiffs Now Plead Around the Rule to Survive a 12(b)(6) Motion to Dismiss?,* 35 AM. J. TRIAL ADVOC. 639, 657, 660 (Spring 2012). We have found no Wisconsin case relying on *Twombly* or *Iqbal* to impose heightened pleading standards.

[7] The defendants cite *Reget v. Paige,* 2001 WI App 73, ¶¶ 10–12, 242 Wis. 2d 278, 626 N.W.2d 302, for the proposition

¶ 25. In this case, the defendants' arguments underscore part of the problem with applying the business judgment rule on a motion to dismiss in a notice pleading jurisdiction. Data Key alleged in its complaint, among many other substantive allegations, that the directors engaged in "willful misconduct by willfully failing to deal fairly with the Plaintiffs and the Company's other minority public shareholders in a matter in which they have a material conflict of interest." The defendants acknowledge this allegation but nonetheless argue that Data Key's complaint comes "nowhere close to satisfying" the exceptions to the business judgment rule and that "nothing resembling" willful misconduct is alleged in Data Key's complaint. The defendants thus appear to take the position that application of the rule at the motion to dismiss stage of proceedings requires that a plaintiff plead facts sufficient to defeat the defense with considerable specificity. Such specificity is generally not required for purposes of notice pleading. *Cf.* Wis. Stat. § 802.03(2) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

¶ 26. For all of these reasons, we conclude that the circuit court erred in applying the business judgment rule in deciding whether Data Key's complaint states a claim against the directors for breach of fiduciary duty. Data Key did not need to allege willful misconduct or other non-compliance with the rule in order to survive a motion to dismiss for failure to state a claim for breach of fiduciary duty against the directors.

---

that "[f]ailure to allege facts sufficient to rebut the [business judgment rule] is fatal to a claim." Neither this proposition nor an equivalent proposition is stated in *Reget*.

### b. Court's Application of Business Judgment Rule and Pleading Standards

¶ 27. We further agree with Data Key that the circuit court's decision on Data Key's claim against the directors for breach of fiduciary duty fails to adhere to the pleading standards that apply on a motion to dismiss, primarily because the circuit court applied the business judgment rule. The court's decision contains numerous instances in which the court applied the business judgment rule and drew reasonable inferences *against* Data Key instead of in Data Key's favor. Those instances include: the court's conclusion that the directors reasonably declined to pursue a deal with Plato because it was not necessarily a "better" deal overall and because "there were considerable questions/issues that existed with regard to the second (Plato) offer"; that the non-Paul directors[8] were "disinterested"; that the non-Paul directors' only incentive was to "close a deal on the best possible terms"; and that "[t]he complaint does not show the directors were guilty of bad faith, self[-]dealing, dishonesty, willful misconduct, or other actions that would take them out of the protections of the business judgment rule."

¶ 28. The court appeared to conclude, in part, that the non-Paul directors were disinterested, in the sense of being impartial, because the primary benefit they were alleged to have received—the vesting of restricted stock resulting in a payout to each non-Paul director ranging from $292,874 to $747,681—was a

---

[8] The parties sometimes refer to "the directors" even when it seems clear that they mean to refer only to the non-Paul directors. The circuit court's decision sometimes uses a similar approach. We generally refer to "the non-Paul directors" in such instances.

benefit they would receive from the sale of Renaissance to any company, not just to Permira. However, Data Key's complaint contains an allegation, at paragraph 62, that supports a reasonable inference that the directors would have received this benefit only from a sale to Permira.

¶ 29. It is unclear whether Data Key now concedes, contrary to that reasonable inference, that the non-Paul directors would have received this benefit from the sale of Renaissance to any company, not just from a sale to Permira. Regardless, we see at least two reasons why such a concession should not result in a dismissal of Data Key's claim against the non-Paul directors for breach of fiduciary duty. First, Data Key alleges at least one other personal benefit to the non-Paul directors resulting from the sale, namely a right to indemnification by Permira. Second, other allegations show that Data Key's claim against the non-Paul directors for breach of fiduciary duty includes at least one theory of liability that does not depend on whether the non-Paul directors had a personal interest in the sale. In particular, Data Key alleged that the non-Paul directors breached their fiduciary duties because they abdicated their responsibilities as directors and submitted to the will of the Pauls. This allegation, together with other allegations in Data Key's complaint, supports a reasonable inference that the non-Paul directors failed to exercise independent judgment or failed to undertake independent investigation before approving the sale, and that this constituted a breach of fiduciary duty even if the non-Paul directors had no personal interest in the sale.

c. *Mendel*

¶ 30. We turn to the circuit court's reliance on *Mendel*. As indicated above, the court concluded that

Data Key failed to state a claim against the directors for breach of fiduciary duty, relying in part on *Mendel* for the proposition that a corporate board is not authorized "to deploy corporate power against the majority shareholders." *See Mendel*, 651 A.2d at 306. For two reasons, we agree with Data Key that the court's reliance on *Mendel* was misplaced.

¶ 31. First, although some of the facts in *Mendel* are similar to some of the facts here, *Mendel* did not involve a motion to dismiss for failure to state a claim and did not involve the same issue. Rather, as Data Key points out, *Mendel* involved a request for a preliminary injunction imposing what the court characterized as the "unprecedented" and "radical" remedy of requiring a board to grant to a third party the option to buy stock in order to dilute the voting power of a majority shareholder. *See id.* at 298–99, 304. The central issue in *Mendel* was whether the directors were obligated to issue such a "dilutive option" in order to fulfill their fiduciary duties, or whether issuing the option might instead violate the directors' duties, including their duties to the corporation and the majority shareholder. *See id.* at 304, 306–07. We see nothing in *Mendel* suggesting that the court's reference to a board's lack of authority to "deploy corporate power against the majority stockholders" refers to something other than the dilutive option.

¶ 32. Second, the proposition from *Mendel* on which the circuit court relied is an incomplete statement. The full statement is as follows:

> The board's fiduciary obligation to the corporation and its shareholders, in this setting, requires it to be a protective guardian of the rightful interest of the public shareholders. But while that *obligation may authorize the board to take extraordinary steps to protect the*

365

*minority from plain overreaching,* it does not authorize
the board to deploy corporate power *against* the major-
ity stockholders, *in the absence of a threatened serious
breach of fiduciary duty by the controlling stock.*

*Id.* at 306 (emphasis added; emphasis on "against" in
original). As we read this statement, it supports Data
Key more than it does the defendants. It suggests that
the non-Paul directors had the authority, consistent
with their fiduciary duties, to take "extraordinary steps"
to protect Data Key and other minority shareholders,
given the Pauls' alleged overreaching and breach of
fiduciary duties. There is no dispute that the non-Paul
directors could have outvoted the Pauls as to any board
action.

¶ 33. To sum up so far, we agree with Data Key's
arguments that the circuit court erred in applying the
business judgment rule at the motion to dismiss stage
of proceedings, in failing to adhere to motion to dismiss
standards primarily by applying that rule, and in its
reliance on *Mendel.* Our analysis of these Data Key
arguments disposes of many of the defendants' argu-
ments because those arguments expressly rely on the
business judgment rule. However, the defendants make
several other arguments in support of the circuit court's
decision.

### d. Defendants' Other Arguments

¶ 34. The defendants argue that the Delaware
Chancery Court in *In re Synthes, Inc. Shareholder
Litigation,* 50 A.3d 1022 (Del. Ch. 2012), "rejected a
virtually identical challenge to a merger at the plead-
ings stage." However, a close read of *Synthes* reveals
that the court did so in reliance on the business

judgment rule, an approach we have rejected. *See id.* at 1032–33. In addition, the court's decision in *Synthes* was at least partially based on the fact that the plaintiffs in that case had "been afforded some written discovery," and had apparently used that discovery to supplement their allegations in a second amended complaint. *See id.* at 1024–25 & n.3. The court concluded that "[i]n these circumstances, allowing the plaintiffs a fourth swing of the bat would not serve the interests of justice." *Id.* at 1024.

¶ 35. The defendants assert, as the circuit court observed, that the Pauls as majority shareholders could have blocked a deal other than one with Renaissance, regardless of any board action. Therefore, the defendants appear to argue, the directors had no duty to consider a deal with Plato. Even if that is true, a question we need not decide, it can reasonably be inferred from the allegations made in the complaint that, assuming that the Pauls were acting contrary to their fiduciary duties as alleged, the non-Paul directors could and should have done more to influence the terms or process of the sale to Permira, or perhaps even to block a sale to Permira.

¶ 36. The defendants argue that Data Key fails to allege any facts showing that the directors' conduct caused Data Key harm. The defendants argue that Data Key's claim against the directors "should be dismissed on this basis alone." *See Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 752 N.W.2d 800 ("The elements of a claim for breach of fiduciary duty are: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) *the breach of duty caused the plaintiff's damage.*" (emphasis added)).

¶ 37. We are not persuaded by this no-harm argument. Data Key's complaint can reasonably be read as

alleging two types of harm caused, at least in part, by the directors' alleged breach of fiduciary duty: (1) the sale of Renaissance resulted in Data Key being "forced to sell" or "losing control" of its Renaissance shares, an alleged harm regardless of the price received for the shares, or (2) the sale of Renaissance resulted in Data Key receiving a price for its shares that was less than the value of its shares, as evidenced by Plato's offers.

¶ 38. The defendants argue that minority shareholders such as Data Key have no "inherent right to retain their stock at their discretion" and that Wisconsin law provides that "minority shareholders can be dispossessed [of their shares] under various circumstances." Therefore, the defendants argue, Data Key fails to allege any harm. In support, the defendants point to WIS. STAT. §§ 180.1101, 180.1102, and 180.1104, which address a variety of fundamental corporate transactions. Those provisions appear to contemplate that shares may be converted to cash in such transactions as long as proper procedures are followed. *See, e.g.*, § 180.1101(2). Without more, however, the provisions do not persuade us that a minority shareholder may never be harmed by a forced sale or loss of control of its shares as long as the minority shareholder receives the shares' value. Regardless, the defendants fail to develop an argument undermining Data Key's second possible theory of harm in this context, that the sale of Renaissance resulted in Data Key receiving a price for its shares that was less than the value.

### 2. Claim Against Pauls for Breach of Fiduciary Duty in Capacity as Majority Shareholders

¶ 39. The circuit court dismissed Data Key's claim for breach of fiduciary duty against the Pauls as major-

ity shareholders for several interrelated reasons, but as we understand it, the crux of the court's reasoning was that the Pauls had the right to sell their shares and to vote their shares in their own interests. The defendants echo this reasoning in their primary arguments in support of the court's dismissal of this claim.

¶ 40. Data Key argues that the allegations in its complaint support an inference that the Pauls did much more than merely sell their shares and vote their shares in their own interests. We agree. Construed liberally, the complaint allegations support a reasonable inference that the Pauls used their majority control, including their ability in that capacity to elect directors, to exert undue influence over the board to cause a sale of the *entire* company under terms that provided special personal benefits to the Pauls and harmed the minority shareholders. Among the most pertinent supporting allegations are the following:

> [T]he Pauls have put, *inter alia,* their personal interest in monetizing their holdings in [Renaissance] (and in receiving the other personal benefits they will receive from the Sale Agreement), ahead of that of [Renaissance] and [its] minority shareholders . . . . [N]otwithstanding the receipt of a fully funded, substantially higher definitive offer [from Plato] to acquire [Renaissance] . . ., the Pauls resolutely continued to support a sale of [Renaissance] to Permira for their own personal reasons notwithstanding that their actions were to the detriment of the Plaintiffs and the . . . other former minority public stockholders who received substantially less upon the sale of [Renaissance] to Permira than they would have received had Renaissance been sold to Plato.
>
> . . . .
>
> . . . [T]he Pauls had sufficient voting power to elect the [Renaissance] Board and to drastically influence all

369

corporate activities, including mergers, proxy contests, tender offers or other purchases . . . .

. . . .

The Sale Agreement was reached through a process controlled by the Pauls, in an attempt to cash out their ownership interests in [Renaissance] at a specific time in order to pursue their plans for retirement . . . . Further, with retirement approaching, the Pauls were eager to monetize their large interest in [Renaissance] and while they potentially could have sold their block of shares in a privately negotiated transaction, they believed the most personally remunerative way to accomplish this was through a sale of the entire [c]ompany . . . .

. . . .

. . . [T]he Director Defendants allowed the Pauls to completely dictate the timing of the sale process from beginning to end, and to arbitrarily cut it off to suit their own personal retirement planning and diversification needs without regard to whether [other approaches would, among other things,] benefit minority shareholders . . . .

. . . .

. . . [T]he Pauls admitted to the Board that the reasons they did not support Plato's higher offer related to their personal interests, including . . . the longer timeline, . . . concerns about claims against them personally, . . . [and] the Plato Proposal apparently did not include the grant [of] . . . a license to use . . . Renaissance's software products and services [to a separate company controlled by the Pauls].

. . . .

. . . [The Board] failed to adequately consider [other options] diluting the coercive effect of the Pauls' majority shareholdings . . . . The Board's failure to consider these other options is due to the fact that they

clearly owed loyalty to the Pauls to whom they owed their positions as directors . . . .

. . . .

. . . [T]he Pauls have engaged in oppressive conduct toward Renaissance's minority shareholders and have breached their fiduciary duties . . . by placing their own interests ahead of the interests of [Renaissance]'s minority shareholders.

In addition, the complaint contains allegations that, if again construed liberally, support a reasonable inference that the Pauls used their personal banking relationship with Goldman Sachs to influence or control the financial advice that Goldman Sachs provided regarding the sale of Renaissance.[9] Accordingly, we conclude that the complaint states a claim against the Pauls for breach of fiduciary duty in their capacity as majority shareholders.[10]

---

[9] In the interest of space, we do not detail this series of other allegations, which includes allegations in paragraphs 47–48, 64, and 66–68 of Data Key's complaint.

[10] The parties debate the significance of the following principle stated in *Grognet v. Fox Valley Trucking Service*, 45 Wis. 2d 235, 172 N.W.2d 812 (1969): "A majority stockholder cannot take the position that his self-interest is superior to that of a minority stockholder." *See id.* at 241; *see also Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 777, 582 N.W.2d 98 (Ct. App. 1998) ("In *Grognet*, the court held that a majority stockholder cannot take the position that his self-interest is superior to that of a minority stockholder."). As the circuit court correctly recognized, *Grognet* appears to focus primarily on shareholders acting in their capacities as officers or directors, not in their capacities as majority shareholders. *See Grognet*, 45 Wis. 2d at 236, 241–42. Accordingly, *Grognet* is of limited use here, apart from establishing, along with *Jorgenson*, that majority shareholders owe a fiduciary duty to minority shareholders. *See id.* at 241–42; *Jorgensen*, 218 Wis. 2d at 778–81. It is enough to say that the principle from *Grognet* can only support, not detract from, our

¶ 41. In arguing to the contrary, the defendants rely, in part, on the undisputed fact that the Pauls received less for their shares than did the minority shareholders such as Data Key. However, it remains reasonable to infer from Data Key's allegations that the Pauls were willing to accept a lower share price because they believed they substantially benefitted in other ways that support Data Key's claims.

¶ 42. Although the circuit court seemed to acknowledge that Data Key made allegations regarding undue influence by the Pauls, the court determined that those allegations were conclusory and therefore insufficient. Specifically, the court stated that, "[w]hile there are some conclusory allegations to this effect, there are insufficient facts alleged to show that the directors were improperly influenced, coerced, or otherwise unlawfully directed to pursue a particular course." The defendants make arguments along these same lines. We disagree and conclude that, when we liberally construe Data Key's complaint, drawing all reasonable inferences in Data Key's favor, Data Key sufficiently alleged undue influence on the directors by the Pauls.

¶ 43. The defendants make other, minimally developed arguments in support of the circuit court's decision to dismiss Data Key's claim against the Pauls in their capacity as majority shareholders. We consider each but find none persuasive.

¶ 44. The defendants appear to argue that, because Data Key made an allegation that the non-Paul directors supported the sale of Renaissance to Permira

conclusion that Data Key's complaint states a claim against the Pauls for breach of fiduciary duty in their capacities as majority shareholders.

because of their own personal interests, Data Key could not also allege that the non-Paul directors supported the sale because of undue influence by the Pauls. We reject this argument at this stage of the proceedings because, even assuming without deciding that these would be inconsistent alternative theories of liability, we see no reason why Data Key could not plead alternative theories based on breach of fiduciary duty. *See* Wis. Stat. § 802.02(5)(b) (permitting pleading in the alternative).

¶ 45. The defendants also argue that Data Key failed to allege any harm caused by the Pauls' actions because Data Key failed to allege that its shares in Renaissance would have been worth more than $16.60 per share if Data Key remained a minority shareholder in "a company owned principally . . . by some unknown buyer." The defendants similarly appear to argue that the "40% premium" that Data Key and other minority shareholders received for their shares forecloses any allegation of harm caused by the Pauls as majority shareholders. This "premium" appears to be calculated by comparing the $16.60 per share Data Key received to the $11.83–per-share price at which Renaissance stock closed on the public market the day before Renaissance and Permira publicly announced plans to merge. Data Key, in contrast, makes clear that its theory of harm, at least as to its claim against the Pauls as shareholders, is that Data Key would have received more for its shares, or at least would have still owned shares of a higher value, had the Pauls acted properly. Under Data Key's theory, the Plato offers illustrate that the price that Data Key actually received from Permira was less than the shares' value.

¶ 46. At this early stage of proceedings, we see no reason why Data Key's theory is necessarily insufficient. The defendants present no authority supporting

their narrow view of harm in this context, namely, the view limited to whether Data Key's shares would have been worth more than the price it received if there had been some other sale, or more than the share index price on the date specified. To the extent that there are legal standards that would limit the methods by which Data Key may prove the value of its shares, the defendants will be free to argue those standards as applied to the evidence as the factual record develops.

### 3. Claim Against Directors for Failure to Disclose 

¶ 47. Data Key argues that the circuit court erred in concluding that Data Key failed to state a claim against the directors for breach of their duty to disclose material information in the proxy statement. The alleged nondisclosures include items such as updates to Renaissance's projected earnings, details regarding the relationship between Goldman Sachs and the Pauls or Permira, details regarding the relationship between the Pauls and Permira, and the amount of compensation Goldman Sachs stood to receive from a sale. As indicated above, Data Key alleged that the omission of this information prevented the shareholders from making informed decisions on whether to vote in favor of the sale to Permira.

¶ 48. The circuit court appeared to conclude that the only reasonable inference from Data Key's complaint was that the undisclosed information could not have changed the shareholder vote, given the allegation that the Pauls were determined to sell Renaissance to Permira and the undisputed fact that the Pauls could block a sale to any company other than Permira. Therefore, the circuit court reasoned, the undisclosed information could not have been causal in any alleged

harm. As an alternative basis for dismissing the claim, the court concluded that Data Key's allegations were insufficient to support a reasonable inference that any of the undisclosed information was material.[11]

¶ 49. As indicated above, it is undisputed that the failure to disclose claim is a breach of fiduciary claim. And as also indicated above, one of the elements in such a claim is that "the breach of duty caused the plaintiff's damage." *See Berner Cheese,* 312 Wis. 2d 251, ¶ 40; *see also Groshek v. Trewin,* 2010 WI 51, ¶ 12, 325 Wis. 2d 250, 784 N.W.2d 163 (following *Berner Cheese* on this point); *Yates,* 319 Wis. 2d 756, ¶ 20 (same).

¶ 50. Data Key fails to develop a persuasive argument that the circuit court was wrong to conclude based on this authority that Data Key's claim for failure to disclose should be dismissed because Data Key's allegations fail to support a theory of causal harm. We now explain why none of Data Key's specific arguments is convincing.

¶ 51. Data Key argues that, while causal harm is required in analogous federal claims, "historically" this has not been true for state law claims. However, Data Key's only authority for this argument is an unpublished Delaware case, *see Wiegand v. Berry Petroleum Co.,* 1991 WL 45361 (Del. Ch. 1991), and we see nothing

---

[11] The parties appear to agree that the standard for materiality in this context is stated in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976). That case provides that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449. It also states the standard as follows: "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (citation omitted). However, our decision does not depend on the precise definition of "material."

in *Wiegand* clearly stating or addressing a rule that causal harm is not required, *see id.* at *9–11. Regardless, Data Key fails to address how its reliance on *Wiegand* can be reconciled with the more recent, and binding, Wisconsin case law stating that the breach of fiduciary duty must cause the plaintiff damage.

¶ 52. If there is some reason why this case law might not be controlling on the question here, Data Key fails to identify it. Data Key cites *Cuene v. Hilliard*, 2008 WI App 85, ¶ 20, 312 Wis. 2d 506, 754 N.W.2d 509, for the proposition that "the obligation to disclose and the withholding of a material fact establish the requisite element of causation in fact," but *Cuene* is not a breach of fiduciary duty case. It involved a statutory claim for securities fraud. *See id.*, ¶¶ 13–21.

¶ 53. Data Key also argues that, if damages caused by a failure to disclose are difficult or impossible to prove, a plaintiff may recover "nominal" or "per se" damages without any allegation of a causal connection. Data Key relies for this argument on the Delaware case of *In re Tri-Star Pictures, Inc., Litigation*, 634 A.2d 319, 326 (Del. 1993). As the defendants argue, however, *Tri-Star* has been overruled in pertinent respects. *See In re J.P. Morgan Chase & Co. Shareholder Litigation*, 906 A.2d 766, 774 (Del. 2006) (limiting *Tri-Star* and holding that " 'a per se rule of damages for breach of the fiduciary duty of disclosure' . . . is 'no longer an accurate statement of Delaware law.' "). Data Key fails to reply on this point, and we take it as conceded. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶ 39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

¶ 54. Separately, Data Key makes a one-sentence argument that, "if money damages were for some reason

not available[,] . . . the Circuit Court would be required to construct another remedy . . ., perhaps unwinding the sale of Renaissance or requiring that full information be provided to Renaissance shareholders and another vote be held." In support, Data Key cites *Estate of Makos v. Wisconsin Masons Health Care Fund*, 211 Wis. 2d 41, 52, 564 N.W.2d 662 (1997), *overruled by Aicher v. Wisconsin Patients Compensation Fund*, 2000 WI 98, ¶ 6, 237 Wis. 2d 99, 613 N.W.2d 849, for the proposition that the state constitution guarantees that "every person shall be afforded a remedy for wrongs committed." We conclude that this one-sentence argument, seeking an extraordinary remedy based on a general proposition, is insufficiently developed and therefore address it no further. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not consider inadequately developed arguments).

¶ 55. Accordingly, we uphold the circuit court's dismissal of Data Key's failure to disclose claim based on that court's conclusion that Data Key's allegations fail to support a theory of causal harm. We need not and do not address the circuit court's conclusion in the alternative that Data Key's allegations were insufficient to support a reasonable inference that any of the undisclosed information is material.

### 4. *Claim Against Permira for Aiding and Abetting*

¶ 56. Finally, we turn to Data Key's claim that Permira aided and abetted the other defendants' alleged breach of fiduciary duty. For the following reasons, we consider this argument undeveloped and therefore uphold the circuit court's dismissal of this claim.

¶ 57. "In Wisconsin, a person may be held civilly liable for aiding and abetting if he or she: (1) undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act; and (2) consciously desires or intends that his or her conduct will yield such assistance." *Edwardson v. American Family Mut. Ins. Co.*, 223 Wis. 2d 754, 764, 589 N.W.2d 436 (Ct. App. 1998). The circuit court concluded that, even if Data Key alleged that the Pauls or other directors breached a fiduciary duty, Data Key failed to allege any facts from which a court could infer the presence of the second element, namely that Permira consciously desired or intended that its conduct yield such a breach. The court further concluded that the only reasonable inference from Data Key's allegations was that Permira engaged in arm's length negotiations with the other defendants. The court observed that Data Key's primary theory of liability against Permira, if accepted, would mean that "any time a suitor makes an offer (or changes its offer) to purchase it would be liable as an aider and abettor."

¶ 58. In its briefing, Data Key points to allegations in its complaint stating or reasonably implying that: Permira negotiated with the Pauls for the sale of Renaissance having "knowledge" of the Pauls' "conflicts of interest"; Permira "incentiviz[ed]" the Pauls to breach their duties because Permira entered into agreements with the Pauls obligating them to vote their shares in favor of a sale to Permira, agreed to the licensing agreement that benefitted the Pauls, and agreed to indemnify the Pauls; and Permira worked with Goldman Sachs at the same time that Goldman Sachs was working with Renaissance.

378

¶ 59. However, Data Key cites no authority addressing the claim of aiding and abetting in the corporate context or suggesting that allegations like these could be sufficient to meet the "consciously desiring or intending" standard. Nor does Data Key provide any explanation, by analogy to *any* legal authority, as to why such allegations would be sufficient. It is far from self-evident. *See Winslow v. Brown*, 125 Wis. 2d 327, 336–37, 371 N.W.2d 417 (Ct. App. 1985) (presence and failure to prevent unlawful conduct not aiding and abetting). In the absence of such authority or explanation, we consider Data Key's argument on this topic undeveloped and decline to address it further. "We cannot serve as both advocate and judge." *Pettit*, 171 Wis. 2d at 647.

## CONCLUSION

¶ 60. For all of the reasons stated above, we reverse the circuit court's judgment dismissing Data Key's complaint for failure to state a claim and remand for further proceedings on Data Key's surviving claims.

*By the Court.*—Judgment reversed and cause remanded.